# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELE BAKER,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>ROMAN CATHOLIC ARCHDIOCESE OF SAN DIEGO; ROMAN CATHOLIC ARCHDIOCESE OF SAN DIEGO dba CATHEDRAL CATHOLIC HIGH SCHOOL; CATHEDRAL CATHOLIC HIGH SCHOOL,<br><br>　　　　　　　Defendants. | CASE NO. 14cv0800 JM(JMA)<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF |

Defendant The Roman Catholic Bishop of San Diego ("RCBSD"), erroneously sued as Roman Catholic Archdiocese of San Diego, Roman Catholic Archdiocese of San Diego, dba Cathedral Catholic High School and Cathedral Catholic High School, moves for summary judgment on Plaintiff Michele Baker's remaining claim for violation of the Americans with Disabilities Act ("ADA"). Plaintiff opposes the motion. For the reasons set forth below, the court grants the motion for summary judgment in favor of RCBSD and against Plaintiff. The Clerk of Court is instructed to enter judgment accordingly and to close the file.

## BACKGROUND

On April 4, 2014, RCBSD removed this action from the Superior Court for the

State of California, County of San Diego, based upon federal question jurisdiction under 28 U.S.C. §§1331, 1441, and 1446. The operative Second Amended Complaint ("SAC") alleges three claims for relief: (1) disability discrimination in violation of the ADA, 42 U.S.C. §12112 et seq.; (2) retaliation and wrongful termination in violation of California public policy; and (3) declaratory and injunctive relief. (Ct. Dkt. 22). Following entry of this court's March 23, 2015 Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, the only remaining claim is the ADA claim.

The parties have now completed discovery and Defendant moves for summary judgment on the remaining ADA claim. The following evidentiary record is largely undisputed. Plaintiff, a 68 year old mathematics teacher, commenced her employment with RCBSD in 2000. Plaintiff was employed via an annual employment contract that would be renewed annually from 2000 through August 2013. The employment contract contained the following provision:

> The term of this EMPLOYMENT AGREEMENT shall be for one (1) academic year commencing on September 1, 2000 and terminating on June 30, 2001. . . . It is understood that . . . there is no obligation to offer TEACHER another contract at the end of that term, notwithstanding the fact that the contract may have been renewed in previous years. . . .
>
> Teacher is familiar with and understands the importance of the teaching of the Roman Catholic Church and agrees to give Christian witness in his/her personal and professional life. By accepting this term of the Agreement, Teacher agrees to respect and implement the policies and regulations regarding Catholic Schools and Catholic education as issued by the Holy See, the Bishop of San Diego, and his delegates, including the Office of Schools, the President and the Principal of the School.

Pursuant to RCBSD's policies, Plaintiff's performance was formally evaluated annually during the first three years of employment and subsequent teacher evaluations were performed as needed. Consistent with the policy, six performance evaluations were conducted throughout Plaintiff's employment with RCBSD. The evaluations each identify from 3 to 17 different areas in Plaintiff's performance that needed improvement. The evaluations noted several areas for improvement: For example, "Need to clearly identify purpose, goals of each day's lesson;" "Inadequate time for homework assignment;" "Work more effectively with administrators;" "Prepare

lessons which reflect a strong understanding of the content;" and "Adhere to all school policies, procedures and regulation."

The school principal, Principal Deely since 2006, would determine which employment contracts would be renewed. Principal Deely testified that he had received both positive and negative comments concerning Plaintiff. While some people at the school considered Plaintiff to be very nice and supportive of students, Principal Deely also testified that he received concerns about Plaintiff's effectiveness in teaching mathematics, managing her classroom, and whether the students received the kind of instruction needed. (Deely Decl. ¶¶9-10). These concerns were voiced by school counselors and several administrative personnel. Assistant Principal Mauro also testified that she received several complaints, or concerns, from teachers and parents concerning Plaintiff's performance.

On August 23, 2012, Plaintiff suffered a fall in the stairwell at work, and struck her head on the concrete. Plaintiff was initially unable to get up and sat on the ground for about ten minutes. Plaintiff then walked to her car, informed the school nurse of the fall, drove home, spoke with Principal Deely, and then drove herself to the emergency room at Sharp's Hospital. Plaintiff underwent a CT scan of her head and neck. She was diagnosed with a concussion. She received an anti-nausea medication and stayed out of work for ten days.

On August 27, 2012, by email, Plaintiff informed Principal Deely that she suffered a concussion and felt dizzy. Subsequently, Principal Deely "asked me periodically if I - - how I was, and I always told him that I had headaches and dizziness, and that was about the extent of it." (AS 296:5-8). In their conversations, Principal Deely expressed concern for her well-being and told Plaintiff to follow her doctor's advice. On September 3, 2012, Plaintiff was medically cleared to return to work. Without providing necessary context as to frequency, severity, or duration, Plaintiff represents that she suffers from double vision, blurred vision, memory issues, hearing issues, dizziness, and nightmares. (AS 193:2012; Oppo. at p.9:6-7). Following the

incident, Plaintiff testified that she was able to competently carry out the duties of her teaching position. (Exh. 1 338:1-342-19). At no time did a medical provider inform her that she could not perform her duties as a teacher.

Shortly after returning to work, Plaintiff filed a worker's compensation claim. From September 2012 through the spring of 2013, Plaintiff was seen by medical personnel on multiple occasions (about once per month) concerning her complaints of headaches and dizziness. Plaintiff requested, and received, time off from her employer to attend doctor appointments. After each medical appointment, Plaintiff was cleared for full duty without any limitations. During this time, Plaintiff was able continue teaching without any accommodation or limitation.

During the first semester of the 2012-13 academic year, Principal Deely received concerns about students and classroom management issues related to Plaintiff's classes. Principal Deely observed Plaintiff on two or three occasions in January and February 2013. Principal Deely observed that Plaintiff did not begin class with a prayer as required, incorrectly solved a math problem on the board and failed to correct the answer when a student pointed out the problem, and did not manage her class well. (Deely Decl. ¶18-19).

Based upon his observations, as well as input from students, parents, and administrators, Principal Deely decided not to offer Plaintiff a new contract for the 2013-2014 academic year. On February 28, 2013, Plaintiff met with Principal Deely and Vice Principal Mauro to discuss the evaluation. Principal Deely discussed the performance evaluation and modified one of the comments in the evaluation. Plaintiff signed the evaluation but disputed the motivation and content of the evaluation. (Exh. 19). Principal Deely informed Plaintiff at the February 28, 2013 meeting that she would not receive a new contract for the upcoming academic year.

On March 18, 2013, Plaintiff contacted her physician and informed her of the following:

> . . . . I fell in August and continued to work. Although I have dizziness, double-vision, and headaches, I felt I was doing a good job. I was told last

>week that my contract would not be renewed. I am devastated and feel unworthy at school. I cannot stop crying. Is it possible to get a note from you to get the rest of the year off, so I can pull myself together and move forward? Please help me. Sincerely, Michele Baker

The physician complied and provided her with a note excusing her from work from April 8, 2013, to June 15, 2013, due to "medical illness." Plaintiff's request for leave was approved and Plaintiff was paid for the remainder of her contract through August 2013.

## DISCUSSION

**Legal Standards**

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. (emphasis in original). The opposing party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

The court must examine the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On a motion for summary judgment,

when "'the moving party bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (emphasis in original) (quoting International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991), cert. denied, 502 U.S. 1059 (1992)).

**The ADA Claim**

The basic theme of the ADA is that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a) (2009). The elements of a disability discrimination claim under the ADA are (1) the claimant has a disability (as defined in 42 U.S.C. §12102(2)), (2) the claimant is qualified to perform the essential function of the job, (3) the claimant has suffered adverse employment action because of the disability. Hutton v. Elf Atochem North America, Inc., 273 F.3d 884, 895 (9th Cir. 2001).

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities of [the] individual [who claims the disability]," or "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The Ninth Circuit in Weaving v. City of Hillsboro, 763 F.3d 1106 (9th Cir. 2014), recently articulated that the term "disability" is to be construed broadly to accomplish the purposes of the ADA.

> A 2008 amendment to the ADA provides, "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). "The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." Id. § 12102(4)(B). Those findings and

purposes specifically express Congress's view that prior Supreme Court and lower court cases, as well as Equal Employment Opportunity Commission ("EEOC") regulations, had given "substantially limits" an unduly narrow construction. ADA Amendments Act of 2008, §2(a)(4)-(8), Pub.L. No. 110–325, 122 Stat. 3553, 3553. "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. §12102(4)(C). According to post 2008 regulations promulgated by the EEOC,

> An impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(1)(ii). Determining whether an impairment is substantially limiting "requires an individualized assessment." Id. §1630.2(j)(1)(iv).

Id. at 1112.

Once an employee establishes a prima facie case of disability discrimination under the ADA, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for adverse employment action. The employee then bears the burden of establishing that this proffered reason is a pretext for discrimination. See Bradley v. Harcourt, Brace and Co., 104 F.3d 267, 270 (9th Cir. 2996) (applying the McDonnell-Douglas burden shifting analysis to ADA claims). The court analyzes the elements of an ADA claim.

Disability

Plaintiff comes forward with evidence to show that, on August 23, 2012, she suffered a concussion when she fell and struck her head on concrete. At that time, Plaintiff also complained of dizziness, headaches, double vision, memory issues, and blurred treatment. Her treating physician would not release Plaintiff to resume her work schedule until September 3, 2012, about ten days after the incident. This evidence is sufficient to establish a cognizable disability for purposes of the ADA: the concussion and related symptoms led to Plaintiff's inability to carry out a major life activity, working, for a period of at least ten days.

While Plaintiff was initially disabled for purposes of the ADA, the evidentiary record demonstrates that, after her return to work, Plaintiff complained of suffering from intermittent headaches and vision problems. However, the evidentiary record fails to establish that Plaintiff's medical condition prevented her from engaging in major life activities. RCBSD comes forward with evidence to show that, after Plaintiff returned to work, she was able to perform the essential functions of her teaching position without aid or assistance. After Plaintiff's return from medical leave on September 3, 2012, Plaintiff testified that she was competently performing her work-related duties including preparing lesson plans, grading homework and tests, meeting with and supporting students, teaching her classes, effectively communicating with students and coworkers, and driving herself to and from school. During this time, Plaintiff testified that she was able to work around whatever unspecified vision and hearing problems she may have had. She also testified that by mid-December 2012, her headaches were no longer an issue and that, on October 11, 2012, Plaintiff informed her treating physician that she experienced minimal symptoms and was functional. (Exh. 1 at 349: 4-11). The October 11, 2012 physician's report noted:

> Today, she complains of very intermittent dizziness, neck pain, and mild headache in the afternoon, which she states is not debilitating. She denies any prior head injuries although she reports a history of arthritis in her neck. She denies any nausea, vomiting, fever, or chills. She denies any numbness, tingling, weakness, or radiating symptoms. She denies any feeling [of] fatigue or lethargic [sic]. She denies problems with confusion. The patient denies any change in vision or hearing.

(Id.). Plaintiff also stated that she "has very minimal symptoms, and [] is functional." Plaintiff was cleared for "full duty" without restrictions or limitations. Since September 3, 2012, Plaintiff's treating physicians determined that Plaintiff was able to perform her usual occupation.[1]

---

[1] The court has not considered medical records submitted by Plaintiff that were not provided to RCBSD. These records are irrelevant to prove that RCBSD was aware of Plaintiff's medical condition or symptoms because they were not provided to RCBSD. (Exhs. U, Z, AB, AC, AE, AG, AH, and AI). The only medical notes provided to RCBSD indicated that Plaintiff could return to full work duty. (Exh. 27, Vol. 2, 365:2-366:12). The records are, however, relevant to Plaintiff's medical

1    On this record, the court concludes that there is no genuine dispute as to the following and that, therefore, the evidentiary record establishes that (1) Plaintiff was disabled, for purposes of the ADA, from the date of her fall, August 23, 2012, through September 3, 2012; and, (2) after this date, the symptoms earlier suffered by Plaintiff no longer prevented her from engaging in any major life activity as required by 42 U.S.C. § 12102(1). While Plaintiff argues that she suffered from night vision issues during this time period, she does not quantify the degree or severity of the night vision issue nor does she identify how that prevented her from engaging in a major life activity (Plaintiff's treating physicians did not place any restrictions on Plaintiff's activities and Plaintiff testified that she drove herself to and from work). Moreover, after the initial 10 day leave period, there is no evidence that any physician suggested that Plaintiff could not maintain the same daily activities as before the fall.

   Finally, Plaintiff argues that even if she were not disabled, she was regarded as disabled by her employer in violation of 42 U.S.C. § 12102(1). To be "regarded" as disabled, Plaintiff must show the RCASD perceived her as having a "physical or mental impairment." 42 U.S.C. §1202(3)(A). To meet her evidentiary burden, Plaintiff cites the following evidence: she met with the Principal about every 7 to 10 days, (AS p.45:9-19); she informed Principal Deely in either January, February or June 2013 that she was suffering from double vision, (AS pp.196:18- 197:1); when asked by Principal Deely, she always told him she suffered from headaches and dizziness and "that was about the extent of it," (AS pp. 295:23 - 296:8). Plaintiff provides no evidence that she informed anyone as to the frequency, severity, duration or any other characteristic of the intermittent vision and headache issues and, therefore, fails to demonstrate that these symptoms were disabling for purposes of the ADA. The evidentiary record also shows that Principal Deely was concerned about Plaintiff's health following the fall, he encouraged her to take the time off she needed to heal, and inquired into Plaintiff's well-being from time to time. Plaintiff, at no time, informed any employee of RCBSD condition.

that she was disabled (except for the one week period following her fall) or that any dizziness or headaches prevented her from engaging in any major life activity. To the contrary, Plaintiff represents that she could, at all times except for the one week leave period at the end of August 2012, perform the duties of her teaching position without aid or assistance.

Plaintiff also repeatedly argues that she suffered from non-descript headaches and vision issues. The generic claims of intermittent headaches and vision issues do not satisfy Plaintiff's evidentiary burden to show that her employer regarded her as disabled for purposes of 42 U.S.C. § 12102(1). That Plaintiff suffers from non-descript headaches or vision issues (there is no evidence as to frequency, severity, duration, or limitation) and informed RCBSD of these facts, fails to show that Plaintiff was regarded as disabled. There is simply no evidence that RCBSD, or even Plaintiff's treating physicians believed, or even considered, that Plaintiff was disabled and could not engage in major life activities such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2)(A). Principal Deely testified that, upon Plaintiff's return to work on September 3, 2012, he was not aware of any restrictions in performing Plaintiff's job as a teacher. Principal Deely further testified that he never observed "anything about Plaintiff to believe that she was in anyway disabled or limited in her ability to do her job or to function generally." (Deely Decl. ¶¶24-25). Moreover, Plaintiff's treating physicians did not limit her availability to work and found, both implicitly and explicitly, that Plaintiff could perform her work responsibilities. Finally, Plaintiff fails to submit any evidence that she had a record of a disability or impairment. On this record, the court concludes that Plaintiff fails to meet her initial evidentiary burden to demonstrate that a genuine issue of material fact exists, with respect to whether her employer regarded her as disabled for purposes of 42 U.S.C. §12102(1)(C).

In sum, the court concludes that Plaintiff was disabled from August 23, 2012

through September 3, 2012. After that date, the evidence is beyond material dispute that Plaintiff was neither disabled nor regarded as disabled.

<u>The Adverse Employment Decision Because of a "Disability"</u>

Plaintiff has the initial burden of demonstrating that her employment contract was not renewed because of a disability. She fails to meet this burden. The evidentiary record demonstrates that Plaintiff remained under a disability from the date of the fall, August 22, 2012, until September 3, 2012, the date Plaintiff returned to work. Principal Deely made the decision in February 2013 not to renew Plaintiff's contract because of perceived performance issues. (Deely Decl. ¶¶10-20). The remoteness in time between Plaintiff's disability, and the decision to not renew the employment contract, does not give rise to an inference that Plaintiff's contract was not renewed because of her disability. Further, there is no evidence in the record that Principal Deely, nor any other RCBSD employee, considered or regarded Plaintiff as disabled. If she was never considered or regarded as disabled, she could not have suffered an adverse employment decision because of her disability.[2]

In sum, the record fails to identify evidence from which a reasonable jury could conclude that Plaintiff did not have her contract renewed because of her disability.

<u>Pretext</u>

At the outset, the court notes that, under the terms of the employment contract, the parties could renew or not renew the contract for any reason, other than a failure to renew the contract because of a disability. Principal Deely testified that he received concerns about Plaintiff's performance and informed Plaintiff that he would be observing several of her classes. Based upon his evaluation, the evidence shows that Principal Deely made the decision not to renew Plaintiff's employment contract because he was not satisfied with Plaintiff's performance. (Deely Decl. ¶¶15-19). In light of this non-discriminatory reason, the burden shifts to Plaintiff to show that the

---

[2] The court discusses Plaintiff's arguments and evidence in context of the pretext prong for ADA liability.

proffered reason was a pretext for disability discrimination.

Plaintiff contends that the non-renewal of the employment contract was more likely than not the product of her disability (or the perception of her disability). As concluded above, however, the evidence does not support that contention. First, Plaintiff contends that RCBSD did not follow its policies with respect to performance reviews and progressive discipline. While Plaintiff concedes that RCBSD complied with its performance review policies (one performance review during each of the first three years and then thereafter "as needed"), she argues that RCBSD had received complaints for years about her performance but took no steps to conduct a performance review until after she reported her disability. Similarly, Plaintiff contends that RCBSD could have followed its progressive disciplinary policies, and she never received a written warning before the non-renewal of the employment contract. These musings, however, do not raise a genuine issue of material fact with respect to the legitimate reasons behind the non-renewal of the employment contract.[3]

Plaintiff contends that RCBSD "failed to conduct performance review[s] to address Plaintiff's purported gross deficiencies." (Oppo at p.20:8-9). The failure to conduct more performance reviews, in light of the deficiencies identified in the earlier performance reviews, Plaintiff concludes, is "evidence of Defendant's discriminatory animus." (Oppo. at p.20:9). In a related argument, Plaintiff contends that RCBSD "cannot explain why, notwithstanding the repeated complaints and poor performance, it continually gave Plaintiff new employment contracts and annual raises and **only after Plaintiff reported her disability**, did Defendant suddenly decide it was time to end the employment relationship." (Emphasis in original; Oppo. at p.20:20-24). The difficulty with this argument is that Plaintiff draws a direct, but speculative, temporal nexus between Plaintiff's disability, which ended in early September 2012, and the

---

[3] In the context of non-renewal of an employment contract, the court highlights that either RCBSD or Plaintiff could decide not to renew the contract for virtually any reason, including arbitrary ones. The only limitation imposed by the ADA is that an employee not suffer adverse employment decisions on account of the disability.

decision to not renew the employment contract on February 28, 2013. The passage of five months time does not support a rational, evidentiary based temporal connection that Plaintiff seeks to establish. This evidence fails to raise a genuine issue of material fact on the question of pretext.

Next, Plaintiff contends that the absence of corroborating evidence, and the treatment of similarly situated individuals by RCBSD, is evidence of pretext. As noted above, RCBSD has met its evidentiary burden to establish a non-discriminatory reason for the non-renewal of Plaintiff's employment contract. Plaintiff's burden is to raise a genuine issue of material fact with respect to whether the reason proffered is a pretext for disability discrimination. Plaintiff does not meet this burden by arguing that RCBSD could have submitted additional evidence. The declarations submitted by former employees, Radostina Zlatanov, Blanca Kressel, and Michael Fares, do not establish that the proffered reasons for the non-renewal of the employment contract was a pretext for discrimination.[4] Ms. Zlatanov declares that she suffered a broken leg in November 2011, required a wheelchair for mobility, "received glowing praise at work from parents, students, as well as Principle [sic] Michael Deely" before she broke her leg, was "subjected to increased scrutiny and criticism by Principle [sic] Deely" after she required the use of a wheelchair, and in the Spring of 2011, she did not have her employment contract renewed. Ms. Zlatanov "believe[s] [she] was wrongfully terminated because [she] had an injury at work and required accommodations to do [her] job." (Zlatanov Decl.). Mr. Kressel declares that in 2008/2009 he began suffering from sciatica and hip pain, had difficulty walking and, on occasion, RCBSD provided a golf cart to assist him in traveling long distances at the school campus. In

---

[4] RCBSD raises evidentiary objections to the declarations of Zlatanov and Kressel, and Fares. RCBSD objects to the declarations on grounds that the representations are not supported by documentary evidence, such as performance reviews, and that the declarants never previously complained of any disability discrimination nor ever filed any EEOC charges. The court overrules these specific objections. These declarations establish, from the personal knowledge of the declarants, their perceptions concerning circumstances related to the non-renewal of their employment contracts.

the Spring of 2010, RCBSD did not renew Mr. Kressel's employment contract. Despite his good work performance and reviews, in the Spring of 2010, Principal Deely informed Kressel that his contract would not be renewed. Notably, unlike Ms. Zlatanov, Mr. Kressel does not state his beliefs regarding the reason for the non-renewal of the contract.

The court concludes that these declarations fail to raise a genuine issue of material fact with respect to the pretextual nature of the reason proffered for the non-renewal of Plaintiff's employment contact. Plaintiff, citing <u>Goldsmith v. Bagby Elevator Co., Inc.</u>, 513 F.3d 1261 (11th Cir. 2006), contends that the declarations are "me too" evidence and demonstrate a discriminatory animus on the part of RCBSD. The declarations establish that both Zlatanov and Kressel were obviously mobility disabled at the time of the non-renewal of the contract. Zlatanov used a wheelchair for mobility and Kressel, due to sciatica, could not walk significant distances. In the present case, except for the initial week or two following Plaintiff's fall and concussion, the record does not establish that Plaintiff was disabled or regarded as such. The fact that the non-renewal of Plaintiff's employment contract did not occur until about five months after Plaintiff was no longer disabled is markedly different from the situation of either Zlatanov or Kressel. The non-renewal of the declarants' employment contracts occurred at a time when they were obviously suffering from a disability. The declarants' temporal connection does not exist in the present case and, in this sense, is not "me too" evidence. The court also notes that only Ms. Zlatanov opines that the non-renewal of the contract was because of her disability. Mr. Kressel expresses no opinion on this issue.[5]

Lastly, Plaintiff refers to the declaration of Mr. Fares for the apparent proposition that Plaintiff did not have performance issues. Mr. Fares, a retired English teacher with CCHS, declares that he substituted for Plaintiff and believed her to be a good teacher.

---

[5] To provide additional context to the declarations, RCBSD represents that several teachers a year (five teachers in 2013) are not offered contract renewals. (Ct. Dkt. 51-4, ¶15).

He also noted that Plaintiff was a "good educator" and her classes were well-organized and operated very smoothly. (Fares Decl. ¶4). This declaration is insufficient to raise a genuine issue of material fact with respect to Plaintiff's performance. Mr. Fares, an English teacher, and not a mathematics teacher, substituted for Plaintiff on a single occasion in March 2013, after Plaintiff went out on medical leave. Mr. Fares did not observe Plaintiff's teaching performance. Rather, he taught a single course, in a field not his own, at a time when Plaintiff had already been informed that her employment contract would not be renewed. The Fares declaration is insufficient to raise a genuine issue of material fact with respect to Plaintiff's workplace performance.

Looking to the cumulative value of Plaintiff's pretext evidence, the court concludes that Plaintiff fails to raise a genuine issue of material fact with respect to the legitimate reasons for the non-renewal of the employment contract. RCBSD is entitled to summary judgment on the remaining ADA claim.

**The ADA Retaliation Claim**

To establish a prima facie case of retaliation under the ADA, Plaintiff must show (1) she engaged in a protected activity; (2) an adverse employment action; and (3) there was a but-for casual link between the protected activity and the adverse employment decision. See Brown v. City of Tucson, 336 F.3d 1181, 1187 (9th Cir. 2003). To the extent Plaintiff seeks to establish an ADA retaliation claim, such a claim suffers from the same defects identified above: (1) a temporal disconnect between Plaintiff's disability in August/September and Principal Deely's decision not to renew the employment contract the following February; (2) the abundant evidence that Principal Deely encouraged Plaintiff to take medical leave, stay out as long as necessary, and make and keep all necessary medical appointments; (3) Principal Deely was constantly solicitous of her injury; and (4) there is no evidence of any opposition to and/or concern about Plaintiff missing work while attending medical appointments. Accordingly, the court concludes that Plaintiff fails to raise a genuine issue of material

1  fact with respect to the ADA retaliation claim.

2       In sum, the court grants summary judgment in favor of Defendant RCBSD, and against Plaintiff, on the remaining ADA claims.  The Clerk of Court is instructed to enter judgment accordingly and to close the file.

5       **IT IS SO ORDERED.**

6  DATED:  June 23, 2016

                                                  Hon. Jeffrey T. Miller
                                                  United States District Judge

cc:         All parties